UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHARON GEER,

                    Plaintiff,

          v.                                          Case No. 15-C-1470

NANCY BERRYHILL,
Acting Commissioner of Social Security,

                    Defendant.

## DECISION AND ORDER

Plaintiff Sharon Geer brought this action challenging the decision of the Commissioner of Social Security denying disability benefits. She claims that the ALJ erred in failing to properly assess and assign controlling weight to the opinion of her treating Rheumatologist and in failing to assign any weight to the conclusions set forth in an unsigned Functional Assessment Rating (FAR) form provided by the Wisconsin Division of Vocational Rehabilitation as part of a psychological evaluation. Plaintiff also claims that the ALJ's credibility determination is not supported by substantial evidence. For the reasons given below, I conclude that the ALJ erred in failing to explain why no weight was given to the FAR. For this reason, the decision of the Commissioner will be reversed and remanded. On remand, the ALJ is also directed to provide a more complete explanation for his credibility assessment.

## BACKGROUND

On June 7, 2012, Plaintiff filed her applications for Social Security Disability Insurance Benefits and Supplemental Security Income, alleging disability with an onset date of January 1, 2011.

A previous application was denied on January 4, 2008, on initial determination with no further appeal. With respect to her 2012 application, Plaintiff identified the conditions that limited her ability to work as chronic asthma, major feet problems, vision problems, nerve damage in her brain, and major headaches. R. 230–31. In a Function Report submitted on July 20, 2011, after her alleged onset date but before the 2012 application, Plaintiff described how her illnesses, injuries, or conditions limit her ability to work: "feet hurt, can't walk much or put weight on feet, back pain makes it hard to stand or lift, can't see well, hip hurts when sitting too long." R. 207. She said she could only walk five minutes before she would have to rest ten minutes and could only lift five pounds. R. 212. She was living with her daughter and her family in a trailer home at the time, and her day consisted of watching television, making coffee, washing dishes and laundry, playing with her grandchildren, and taking a nap. She stated she stayed in her room and watched television a lot. R. 208. Her only medications consisted of an inhaler and Tylenol. R. 214.

The medical record dates back to November 2007, when Plaintiff, then a resident of Texas, apparently filed her first application for disability benefits on allegations of "asthma/heart attack/arthritis/back/carpal tunnel." R. 283. Plaintiff was seen by Dr. Raj Saralaya in Amarillo and provided a history of steadily worsening low back pain, arthralgias, bilateral foot pain, migratory pain in her hands and wrists, and asthma (though she continued to smoke a pack per day). Plaintiff also claimed she had been hospitalized for a heart attack in March 2006, but had no chest pain since. R. 284. The physical examination performed by Dr. Saralaya was essentially normal, as were the x-rays taken of her spine. R. 285–90.

Most of the medical records in the file concern Plaintiff's foot problems. An October 2008 x-ray report notes hallux valgus and bunion deformity on her left foot with soft tissue swelling and

edema noted. If symptoms persisted, additional imaging was recommended for further evaluation. R. 306. On July 25, 2012, a disability consultative examination was performed by Dr. Hector Ortiz in response to Plaintiff's current application alleging disability due to asthma, pain in her left foot, decreased vision, and headaches. R. 311–13. Plaintiff was then smoking two packs per day, despite her complaints of asthma, and gave a history of having broken her left foot in 1976. R. 311. Plaintiff's claim that she fractured her foot in 1976 is noteworthy in light of the fact that x-rays of her left foot in 2008 revealed no evidence of a fracture, old or new, and the accompanying report indicates no history of a prior injury to the left foot. R. 306–09. In any event, Plaintiff stated that the pain in her left foot had been going on for several years and was getting worse. She said the pain was aggravated by tight shoes and heels, and by standing and walking, and was associated with swelling on the lateral aspect of the foot and ankle and stiffness of the ankle along with pins and needles sensations in the foot. R. 311. She also reported a history of headaches, for which she took Tylenol, and blurry vision with the left eye worse than the right. She indicated she was supposed to wear glasses but could not afford them. *Id.*

On exam, Dr. Ortiz noted Plaintiff's gait was slow and unsteady with difficulty standing on her left heel and toes. Bending forward caused back and left hip pain, but straight leg raising was negative with alignment and position of legs being bilaterally symmetrical. R. 314. Plaintiff had some restriction of range of motion in her spine and left ankle and toe, but normal range of motion in her other extremities. She had 5/5 strength in all muscles of upper and lower extremities on restricted maneuvers, and there was no evidence of fasciculations (twitching), atrophy, or rigidity. Her deep tendon reflexes were symmetrical, her grip was 5/5 bilaterally, and her fine finger movements were normal. Her sensory exam was also normal in intact to light touch, pin and

3

position. R. 314–15. Chest x-rays revealed her cardiac size and pulmonary vascularity were normal. R. 318.

Plaintiff was next seen on August 17, 2012, for a complaint of injury to her left foot. X-rays confirmed the bunion reported previously, but there was no evidence of osseous or soft tissue injury to the foot. R. 321. X-rays of the right foot taken at the same time also showed no evidence of injury and a normal right ankle. R. 322.

Based on a review of this record, Dr. Leigh McCary, a consulting physician, concluded on September 12, 2012 that Plaintiff was capable of light work with only minor postural limitations and that she could walk, stand, and sit for six hours of an eight-hour day. R. 347–54. Dr. McCary found that the severity of the symptoms Plaintiff alleged were not supported, and that while she had a hallux deformity, there was no evidence of neuropathy. Dr. McCary specifically found that Plaintiff's walking limitations were unsupported. R. 354. An examination or record review in November 2012 by Dr. Theresa Fox indicated no evidence of statutory blindness. R. 373. As a result, on March 12, 2013, the previous determination that Plaintiff was not disabled and was capable of performing her previous work as a housekeeper was left unchanged. *Id.*

In the meantime, in February 2013, Plaintiff moved in with her brother in Menasha, Wisconsin. R. 73. On February 15, 2013, Plaintiff presented at the Fox Cities Community Clinic for an annual physical and to establish care at her new residence. R. 486. She was seen by Advanced Practice Nurse Practitioner (APNP) Ryan Gerhartz. Plaintiff was blind in her left eye and had cataracts in her right. She gave a history of a heart attack four years ago, but NP Gerhartz noted no chest pain, palpitations or abnormal pulse and there was no ankle edema. She reported a history of asthma, but denied cough, wheezing or shortness of breath, and was again down to smoking a

4

pack a day. Under review of musculoskeletal system, NP Gerhartz listed "possible arthritis of right foot and knees." And under neurologic, NP Gerhartz noted "reports facial pain all over, seen in Texas –Trigeminal Neuralgia." *Id.*

With respect to the latter diagnosis, the only medical record dealing with facial pain from Texas is a report dated April 15, 2011, indicating Plaintiff went to the emergency room at a hospital in Amarillo, Texas on that date with a chief complaint of headache in the left eye and forehead area of her face that started the preceding day and was of moderate severity. She denied having experienced similar symptoms previously. R. 296. Although other parts of the same report indicate that Plaintiff rated the pain at a 10 and denied that it was a headache, R. 294–95, she was discharged home the same day with a clinical assessment of acute headache. R. 297. No other records from Texas address this type of headache, nor do they carry a diagnosis of trigeminal neuralgia. Yet, NP Gerhartz apparently concluded from what Plaintiff told him that she had been diagnosed with trigeminal neuralgia when she lived in Texas, R. 488, and the diagnosis has been repeated in the clinic's records since. Plaintiff also told NP Gerhartz that she had only taken Ibuprofen for the condition, but explained that she had ulcers and so it was bad on her stomach. NP Gerhartz therefore decided to try gabapentin for Plaintiff's trigeminal neuralgia and start Plaintiff back on Albuteral and Advair for her asthma. *Id.*

Plaintiff returned to the clinic on March 13, 2013, for a follow-up on her asthma and concerns with joint and hip pain. She noted significant improvement in her asthma with the Advair and Albuteral, noting she had not had any severe asthma attacks and that her breathing was better overall. She complained of pain in the left hip/buttock area causing numbness and pain down the back of her leg. She also noted pain in both knees which she attributed to arthritis. Finally, she

5

reported she had stopped taking the gabapentin for her trigeminal neuralgia because of the side effects. R. 482. Upon examination, NP Gerhartz found her back symmetrical with normal range of motion and negative straight leg raising. He prescribed a muscle relaxant and a dose of prednisone for the hip/buttock pain and meloxicam for her knee pain. NP Gerhartz also switched her gabapentin to tramadol for her trigeminal neuralgia and told her to follow up in three months. R. 483–84.

Also in March 2013, Plaintiff was referred to Affinity Medical Group for an ophthalmologic exam by an optometrist at Walmart because of her "extensive cataracts." The examination revealed extensive cataracts causing her decreased vision and legal blindness in the left eye. R. 426. An extraction procedure was performed in April, and by May 14, 2013, she had 20/20 corrected vision in each eye. R. 419–24.

In June 2013, Plaintiff was seen by Dr. David Miller, a podiatrist, for her foot pain. Plaintiff reported difficulty finding shoes that would fit because of the hallux deformity and noted that it caused her to alter her gait and pain as well. Dr. Miller recommended outpatient surgery on each foot, beginning with the left, to decrease pain and increase her ability to stand throughout the day. R. 417. The first surgery was performed on June 17 and the second on August 26, 2013. R. 411, 447. Post operative reports for both procedures noted the alignment of the metatarsal joint was stable and Plaintiff progressed as expected to full weight-bearing. R. 412, 447–69. At her final post operative visit on November 14, 2013, she was doing significantly better and was happy with her progress. Incisions on both feet had completely healed, she had good muscle tone, and x-rays revealed solid fusion of the joints. R. 505.

On October 17, 2013, Plaintiff returned to the Fox Cities Community Health clinic for a follow-up on her complaints of arthritis and neck pain, the latter which she attributed to a car

6

accident years ago. She complained that her arthritis was getting worse and felt like it was in every joint. She wanted to know about seeing a Rheumatologist. R. 475. NP Gerhartz referred her to Dr. Kent Partain, a Rheumatologist, who saw her on October 31, 2013.

At her initial consultation with Dr. Partain, Plaintiff recounted a history of "gradually seemingly inspissated onset of pain about the muscles, bones, and joints" that seemed to cover her entire body. She reported her symptoms intensified with cool, damp changes in the weather. At the time of examination, she complained of midcervical spine pain and said that "all movements are uncomfortable with perhaps some reduced mobility." She reported pain along the superior border of the trapezius, the muscles between and overlying the scapula, and mid paralumbar spine pain that was exacerbated with flexion and extension with reduced mobility. She claimed she found it difficult to comfortably stand for about five minutes at a time, citing a numbing shooting pain down the posterolateral aspect of the left leg, typically to the knee, at times to the ankle. She reported this may occur up to once or twice daily for up to five to ten minutes at a time. Plaintiff complained of pain along the left lower costal margin. She had crepitus about the shoulders without loss of mobility and pain along the medial aspect of the left elbow without redness, warmth, swelling, or loss of mobility. She also reported pain in the region of the recently fused MCP joints, discomfort about the tops of her hands, and numbness of both hands when holding a phone, driving a car, or at night. There was also crepitus and pain around the kneecaps, and she reported intermittent locking two to three times a week for up to 10 to 20 minutes. She also claimed her knees occasionally gave way on her; she had reduced hearing; episodes of dizziness or lightheadedness at least two to three minutes daily; sinus congestion; chest discomfort, particularly when excited, on almost a daily basis; swelling of the legs near the end of the day and a history of chest pain and/or pressure intermittently;

7

abdominal discomfort; constipation with bowel movements every three to four days; frequent urination at night and urinary incontinence with cough or sneeze; easy bruisability; and excessive perspiration. She also stated she has trouble with headaches five to six days a week, which began in the neck, spread to the occipital area, and then diffusely about the head. R. 507–08.

On physical examination, she was found alert, well nourished with appropriate grooming. Her deep tendon reflexes were normal and symmetrical, and straight leg raising was negative. Her motor strength in proximal and distal muscles of upper and lower extremities was symmetrical and normal. She had full flexion of the cervical spine and extension to about 30 degrees with rotation about 30 degrees and lateral flexion 20 to 30 degrees with some pain on lateral flexion. Numerous areas of tenderness were also noted. R. 510–11. Based on his examination, Dr. Partain listed his number one impression as arthralgia, followed by depressive disorder not elsewhere classified. Noting that Plaintiff "appears to have fibromyalgia syndrome," Dr. Partain added six medications to what she was then taking and provided her a list of books and websites devoted to fibromyalgia. He then had her scheduled for a follow-up appointment in two to three months. R. 513–14.

Dr. Partain next saw Plaintiff on January 9, 2014. She listed managing pain as her top concern and reported symptoms most recently of nausea, depression, hyper/anxiety, shortness of breath, and fatigue recently. R. 502. Dr. Partain noted various areas of tenderness and listed her number one problem as fibromyalgia. He modified her medications and scheduled a follow-up appointment in three to four weeks. R. 504.

Plaintiff's next visit to Dr. Partain was on February 5, 2014. She reported that "overall she was doing better since last evaluation although still not quite where she would like to be. She is not feeling as down, is having a bit better sleeping pattern." R. 496. Dr. Partain noted tenderness "along

8

the superior border of the trapezius, the paracervical, dorsal, sacral spine, the biceps, the lateral elbows, and the lateral hips. His impressions remained fibromyalgia with a depressive disorder not elsewhere classified. As to both conditions, he noted she appears to be doing better and increased her prescription for fluoxetine and indicated he would consider a trial of baclofen if she continued to experience difficulties. R. 498–99.

This was apparently the last time Dr. Partain saw Plaintiff for treatment prior to her hearing on May 28, 2014. On April 28, 2014, Dr. Partain wrote a letter to Plaintiff's attorney apparently in response to his request for an opinion concerning her disability claim. Dr. Partain stated that "at the present time I do not have sufficient information to make a disability determination on your client." R. 516. He noted that she had been doing better at her last appointment on February 5, that he was not quite sure what her goals were regarding additional treatment, and that she had not mentioned her desire to apply for disability. Dr. Partain also noted that "since pain as well as disability from pain and fatigue has a significant component of subjectivity to its evaluation, I do not feel comfortable in filling out disability forms until I have had further discussions with the patient and that she has demonstrated to me a good faith effort at trying to avoid disability." *Id.*

Notwithstanding his reluctance, however, Dr. Partain signed a "Fibromyalgia Syndrome Medical Assessment Form" on May 15, 2014, indicating Plaintiff had severe functional limitations rendering her incapable of employment in any capacity. R. 518. He rated her pain/parathesia as "constant typically ranging in severity from 6–8/10 to 10 worst pain imaginable." R. 517. He listed positive objective signs of her impairments as spasm, muscle weakness, abnormal gait, chronic fatigue, impaired sleep, and weight change, but denied any significant limitation of motion. R. 518. He thought she could walk only one block, sit for only 15 to 20 minutes at a time, and stand for only

9

10 minutes. Altogether in an eight-hour day, she could stand or walk less than two hours and sit about two hours. In addition, Dr. Partain thought Plaintiff could lift ten pounds or less rarely and would need unscheduled breaks of about five minutes every 10 to 20 minutes throughout the day and still miss work more than four days a month. R. 519–22.

In a "Letter Of Support For Disability Application" dated May 18, 2014, only ten days before the hearing, Dr. Partain further elaborated on his opinion that Plaintiff was disabled, noting that when he had reviewed the form in response to her request that he assist her "in preparing her answers on this form," it became evident "that she had difficulties understanding the relatively straightforward questions on it be it from difficulties with learning, education, or her symptoms of anxiety." R. 523–24. The letter notes Plaintiff's recent history of surgeries for her eyes and feet, that she had an abnormal stress test, the fact that she dropped out of school after the eighth grade to help care for her sick mother, and states "with firm conviction" that Plaintiff "was not employable in any full-time job on a consistent basis for well over a year." While Dr. Partain concedes he "cannot predict the outcome of the patient's carotid artery or cardiac evaluation nor her response to treatment," he states "to a reasonable degree of medical certainty that she would not be employable for at least the next one year." He concludes with the statement: "I do believe the patient warrants receipt of disability payments. Ideally, I would like to see reevaluation of her ability to work within the next 12 to 18 months." R. 524.

At the hearing, Plaintiff testified that she would be unable to stand six hours out of eight due to "whole body aches, my feet, my back." R. 76. She had worked as a personal care worker and house cleaner, but she said she quit her last job after missing too many days due to being unable to

10

work.  However, she accepted unemployment benefits for about two years and was looking for other work during that time.  R. 78–79.

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform light work, with certain limitations including the need to avoid ladders, heights, ropes, etc.  The ALJ found that Plaintiff could perform her past work as a personal care worker, and, in the alternative, he concluded that other available jobs included assembler, kitchen helper, food preparation worker, and counter clerk.  R. 33–36.  Accordingly, the ALJ concluded that Plaintiff did not meet the Agency's definition of disability.

## LEGAL STANDARD

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'"  *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn.  *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).  The ALJ must provide a "logical bridge" between the evidence and conclusions.  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination.  Failure to do so, unless the error is harmless, requires reversal.  *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).  In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence,

11

resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 637 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Treating Source

Plaintiff first argues that the ALJ improperly failed to assign controlling weight to the opinion of treating source rheumatologist Dr. Kent Partain. In particular, Plaintiff contends that the ALJ erred in failing to explain why he rejected the limitations Dr. Partain listed in the fibromyalgia questionnaire he signed on May 14, 2014, and his letter of May 18, 2014.

The ALJ gave little weight to this opinion, citing several reasons. First, Dr. Partain had been a treating source for only a matter of months. Second, his conclusions were based on Plaintiff's subjective complaints, as recounted solely by her. Third, Dr. Partain himself noted the lack of mental health treatment, and there was no indication that her treatment with the drugs prescribed by Dr. Partain was not successful. R. 29. In addition, the ALJ found that the balance of the record indicated that Plaintiff was not as limited as Dr. Partain believed. R. 32. Citing one example, the ALJ found that Dr. Partain had found Plaintiff had very limited use of her hands, whereas Plaintiff herself testified that she had no problems with her right hand at all. R. 8. "In general," the ALJ concluded, "Dr. Partain's extreme limitations are provided without much explanation or rationale given, and are not well-supported by significant medical evidence, as outlined above." R. 33. Finally, the ALJ observed that Dr. Partain had found Plaintiff had been "doing better" at her February 2014 appointment and was still adjusting her medication. R. 516.

12

The opinion of a treating doctor usually is given controlling weight because a treating source is assumed to be familiar with a claimant's medical issues over time and can provide a unique perspective. *See* 20 C.F.R. § 404.1527(c)(2). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(c)(1)) (other citation omitted).

The reasons the ALJ cited for giving little weight to Dr. Partain's opinion are among those that courts and the regulations themselves have allowed. First, the ALJ was clearly correct to cite the fact that Dr. Partain did not have an extensive treatment relationship with Plaintiff. 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source."). Dr. Partain had seen Plaintiff only a few times over the course of several months, and thus his opinion was not entitled to the "more weight" that might be given a more extensive and longer-lasting doctor-patient relationship. *Susalla v. Astrue*, No. 1:11-CV-00164, 2012 WL 2026268, at *10 (N.D. Ind. June 5, 2012) ("the ALJ was entitled to consider the relatively short duration [nine months] of Susalla's treatment relationship with Dr. Kalapatapu"). Given the relatively brief treatment relationship, Dr. Partain's opinions about the

13

Plaintiff's mental health condition, and her ability to deal with pain, may be discounted on the grounds that he simply did not know his patient in the way some treating providers do.

Second, the ALJ rightly noted that Dr. Partain's conclusions were more extreme than the medical record warranted. *Loveless v. Colvin*, No. 4:14-CV-36-JVB-PRC, 2015 WL 1608808, at *2 (N.D. Ind. Apr. 10, 2015), *aff'd*, 810 F.3d 502 (7th Cir. 2016) ("Dr. Cusack stated Plaintiff was unable to carry more than five pounds but the record evidence showed that claimant had been able to lift 'well over five pounds since 2011' and that there was no indication in the medical evidence that Plaintiff was as limited as Dr. Cusack claimed in the use of his hands . . . ."). When a treating source's opinion conflicts with the record, particularly the plaintiff's own testimony about her limitations, the ALJ may rightly give the opinion less weight. The use of one's hands is a crucial factor in performing almost any work, and so Dr. Partain's misapprehension about Plaintiff's use of her hands was potentially a large factor in the somewhat dire physical limitations he imposed upon her.

Third, the ALJ cited the fact that the bulk of Plaintiff's limitations rested on her subjective complaints. *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) (finding "the ALJ properly discounted Dr. Cusack's medical opinion that rests entirely on the claimant's subjective complaints"). Indeed, Dr. Partain cited this very reason for declining to offer any opinion on whether Plaintiff was disabled in his April 28 letter to Plaintiff's counsel: "Since pain as well as disability from pain and fatigue has a significant component of subjectivity to its evaluation, I do not feel comfortable in filling out disability forms until I have had further discussions with the patient and that she has demonstrated to me a good faith effort at trying to avoid disability." R. 516. This is not to call into question the diagnosis of fibromyalgia which is based on the patient's response to the palpation of

14

the well-known 18 trigger points on the human body, along with the exclusion of other disorders that could cause the same symptoms. *See* SSR 12-2p, 2012 WL 3104869, at *3 (July 25, 2012). The question here, however, is not whether Plaintiff has fibromyalgia, but whether it is of such severity that either by itself or when considered with Plaintiff's other impairments, it rendered her incapable of performing work within the RFC determined by the ALJ. As to this issue, Dr. Partain failed to offer any reason why his decision had changed so dramatically from April 28 to May 18 as to Plaintiff's condition.

It is clear from the summary of evidence above that additional reasons could be offered for discounting Dr. Partain's opinion, such as the fact that until the meeting with Dr. Partain on October 31, 2013, the medical record contains little to suggest that Plaintiff's pain from fibromyalgia was a significant part of her disability claim filed on June 2, 2012, which was originally predicated on chronic asthma, major feet problems, vision problems, nerve damage in her brain, and major headaches. R. 230–31. Similarly, Dr. Partain's reference in his May 18 letter to Plaintiff's foot and eye surgeries, which so far as the record shows had been successful, and her cardiac concerns, which were entirely unsubstantiated, as well as his reliance on her educational background with apparently no knowledge of her vocational experience, suggest that he was relying on matters outside his area of expertise in arriving at his opinion. The failure to cite additional reasons apparent from the record, however, does not undercut the fact that the reasons cited by the ALJ were sensible grounds for giving less weight to the opinion of the treating source here. Remand because of the ALJ's consideration of the treating source is therefore not warranted for any error in that respect.

15

**B. Functional Assessment Report**

Plaintiff also alleges error because the ALJ did not indicate how much weight he assigned to the Functional Assessment Rating (FAR) conducted by the Wisconsin Department of Work Force Development. The FAR was a form prepared in connection with a March 8, 2013 psychological report from the Wisconsin Department of Workforce Development, Division of Vocational Rehabilitation (DVR). Plaintiff had been referred for evaluation to assist with differential diagnosis and vocational planning. It is worth noting that the evaluation was performed before Plaintiff underwent corrective surgery for her foot problems and cataract surgery for her vision problems. The report was written by Dana Bernstein, M.S., the testing center director, and included the results of IQ testing Ms. Bernstein had done on Plaintiff, as well as Ms. Bernstein's observations and a lengthy history provided by Plaintiff. R. 431–38. Based on the IQ testing she completed, Ms. Bernstein concluded that Plaintiff functions at the low end of the low average range of intellectual abilities. Ms. Bernstein noted that Plaintiff had "many medical concerns and reported conditions" but had received limited treatment due to lack of insurance. Of course that changed over the following year as she received surgical correction of her hallux deformity and cataract extraction for her eyes. Ms. Bernstein listed diagnoses of anxiety disorder not otherwise specified and depressive disorder not otherwise specified on axis I and vision limitations, asthma, arthritis, back pain, trigeminal neuralgia, reflex sympathetic dystrophy, bilateral carpal tunnel syndrome, and history of cardiac event on axis II. R. 438. In the attached FAR she completed, Ms. Bernstein listed Plaintiff's "other visual impairments" as Plaintiff's "primary impairment" and "cognitive impairments (learning, thinking, processing info)" as her "secondary impairment." R. 441. Ms. Bernstein indicated that Plaintiff had no serious limitations in mobility, self-care, or interpersonal skills, but that she did have

16

serious limitations with communication, work tolerance, and work skills. *Id.* These limitations were largely the result of Plaintiff's borderline IQ (80), which caused problems with spelling and reading, as well as problems with job pace and complexity. Her problems with work tolerance were chalked up to her inability to handle stress, as well as the fact that she felt "pain all over her face." *Id.* The ALJ, however, did not incorporate these limitations into the hypothetical questions posed to the vocational expert. Nor did he impose any related limitations into Plaintiff's residual functional capacity, which the ALJ deemed to be light work with certain added physical limitations (e.g., no ladders, ropes, or exposure to heights.) R. 33. Accordingly, because the RFC did not reflect any limitations due to her mental health, Plaintiff believes the jobs the ALJ found appropriate do not reflect the actual limitations found in the medical record.

I note at the outset that Plaintiff's argument is really a challenge to the ALJ's finding that she did not have a serious mental impairment. Having found that Plaintiff did not have a serious mental impairment, it made no sense for the ALJ to add limitations to the RFC that are caused by such an impairment. It was in this respect that the FAR report was relevant.

It is also important to note that the ALJ did not simply ignore the FAR report. In discussing it, the ALJ observed that the difficulties noted on the report were noted as "factors related to job placement," which he viewed as factors not intended to be cited as indicia that Plaintiff was unable to perform any gainful employment. R. 28. Indeed, the ALJ found that the report appeared to assume that Plaintiff would be able to find suitable employment so long as she obtained "vocational assessment, job development, [and] job coaching." R. 441. The ALJ further concluded that the remainder of the medical record did not support any significant limitations owing to her mental health. He discussed Dr. Partain's diagnosis of depression and anxiety, finding that "there has been

17

no indication that the claimant has had any adverse response to the routine medication treatment prescribed by Dr. Partain for her complaints of depression and anxiety, or that she has displayed any resulting long-term limitations on her ability to perform the mental aspects of basic work activities." R. 29. In addition, the ALJ noted that "there is no evidence in the file to establish that the claimant has experienced any significant change in her activities of daily living due to her mental condition." *Id.* Finally, the ALJ noted that her mental symptoms have been managed conservatively, suggesting only minimal impairments. R. 32.

There is no requirement that an ALJ incorporate every limitation from a state DVR functional assessment into the RFC itself or the questions posed to a vocational expert. Instead, an ALJ is under a more general obligation to include all limitations supported by medical evidence in the record. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Here, the ALJ's discussion makes clear that he did not believe any such limitations were supported by the medical evidence.

However, the reasons given by the ALJ for discounting the report are not sound. First, the ALJ's belief that the DVR form was premised on Plaintiff's ability to work does not mean that Plaintiff's psychological limitations may be written off entirely. R. 28. Even it if is true that the form suggests Plaintiff might find *some* employment with the proper job coaching, etc., that does not mean such employment would contain no limitations based on performance, pace, and the like. The ALJ also gave as a reason for discounting Ms. Bernstein's opinion that "the various diagnostic elements have been based largely on the claimant's own statements," R. 28, but that is true of most psychiatric diagnoses. The ALJ stated that the difficulties noted in the FAR "were not characterized as significantly limiting; rather they were seen just as factors related to job placement." *Id.* But in fact, the form concludes that Plaintiff's limitations would "interfere with" her ability to get and keep a job,

18

and notes "serious limitations" in work tolerance, an inability to handle stress, and a need to consider job pace and complexity. R. 441. "Serious limitations" would seem to be "significantly limiting." If they are not, some explanation for the difference should be provided.

This form is based on a clinical interview conducted by an individual with a masters in social work or psychology, whose report of the interview indicates that "job pace, complexity and familiarity would be among considerations if she were to attempt working." R. 438. These concerns echo those of Dr. Partain, who observed that "she finds it quite difficult to function in . . . stressful situations because of her anxiety." R. 524. Even if the ALJ was within his rights to give less weight to Dr. Partain's conclusions about Plaintiff's overall ability to work, it cannot be ignored that Plaintiff was receiving prescription medication from him to treat anxiety and depression. The ALJ concluded that her mental health symptoms had been managed "apparently successfully," but that conclusion, such as it is, is undermined by the fact that the treatment relationship with Dr. Partain was so limited, as the ALJ noted. Most tellingly, the treatment provider in charge of managing her symptoms (i.e., Dr. Partain) apparently believed that her symptoms had *not* been adequately treated. R. 34. In sum, the fact that the FAR form was suggestive of *some* ability to work did not mean that its author believed Plaintiff could perform light work, as defined in the regulations, without any accommodations for pace or job complexity.

The ALJ also discounted any mental health limitations on the basis that Plaintiff had received only conservative treatment for her mental health issues, and "the need for intervention by a mental health provider has not been demonstrated." R. 29. Moreover, he concluded, "the conservative approach to her symptoms have [sic] shown that there have been no substantial deficits in her social functioning, concentration, persistence and/or pace." *Id.* In some cases the resort to conservative

19

treatment would warrant an inference that the underlying symptoms are not especially limiting, for example, if someone alleges crippling pain but takes only the occasional aspirin. Here, however, there was ample evidence in the record that Plaintiff's conservative treatment was due to a lack of funds and insurance: "She has had limited medical treatment due to lack of health insurance," R. 438; she was referred from an "indigent local clinic," R. 523; "Due to the patient's lack of insurance and monetary resources, she has not been able to fully engage in active treatment for her symptoms of pain, fatigue, and depression until just recently." R. 524. Thus, the fact that there had been no "intervention by a mental health provider" is not evidence from which one could draw any reasonable inferences about the severity or limiting capacity of Plaintiff's symptoms. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("[A]lthough the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.").

This is not to say that the ALJ was wrong in finding Plaintiff did not have a severe mental impairment; only that the explanation provided seemed to misread the FAR and the reasons given for rejecting Ms. Bernstein's conclusions were not sound. On remand the ALJ should more carefully consider the FAR and accompanying report of Ms. Bernstein in relation to the question of whether Plaintiff has a severe mental impairment that warrants the addition of other limitations in the RFC.

20

## C. Credibility Assessment

Plaintiff also challenges the ALJ's credibility assessment, arguing that it is not supported by substantial evidence. The ALJ noted that Plaintiff received unemployment compensation benefits even while complaining of foot problems after her alleged onset date and looked for work prior to surgical intervention. The ALJ also emphasized the surgical correction of Plaintiff's foot and vision problems and control of her asthma and trigeminal neuralgia, which evidence sharply contrasted with Plaintiff's claim that these conditions continued to prevent her from working. R. 73–75. Little was offered, however, as to why Plaintiff's description of symptoms caused by her fibromyalgia were not credible. It may be that having found some of her statements incredible, the ALJ concluded she was not an accurate source of information. After all, it would be an impossible task to require a separate credibility ruling on each and every statement. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir.2005) ("[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration."). But it is unclear from the decision what the ALJ's thinking was. The ALJ also relied upon "claimant's actual functioning as shown by her admitted activities of daily living and work history." R. 34. There is little in her reported daily activities, however, that is inconsistent with her claims insofar as this court can see. More explanation would be helpful.

Credibility determinations, to be sure, are not simple matters in Social Security Disability cases. As the Commissioner notes in his brief, "claimants 'have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of other evidence in the case.'" Def.'s Br. at 16 (quoting *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006)). But the crucial limitation is "on the basis of other evidence in the case." The

21

agency's own rules require the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). In other words, the ALJ cannot discount a claimant's testimony about pain if she has an impairment capable of producing such pain just because, as a general matter, claimants have an incentive to exaggerate their symptoms. Moreover, the requirement that the ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight," *id.* at *2, makes it difficult for an ALJ to rely upon the claimant's demeanor or the kind of subtle but inconclusive factors that are difficult to articulate but that jurors or other factfinders often rely on in deciding credibility questions in more formal civil or criminal proceedings. As the ruling further elaborates, "The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *Id.* at *4. Curiously, the demeanor of the claimant, consideration of which is the one factor on which appellate courts defer to the factfinder on the issue, *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2000), is not among the factors the ruling instructs ALJs to consider in making their credibility determination.

The new ruling which supersedes SSR 96-7p goes further in entirely removing the issue of credibility from consideration and now asks only if the claimant's statements about his symptoms "are (or are not) supported or consistent." SSR 16-3p, 2016 WL 1119029, at *9 (Mar. 16, 2016). In the words of the new ruling:

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities or, for a child with a title XVI disability claim, limit the child's ability to function independently, appropriately, and effectively in an age-appropriate manner.

*Id.* at \*10. The bizarre effect of this ruling, like its predecessor, is to create for any claimant with an impairment that could produce the symptoms alleged a rebuttable presumption that he or she is telling the truth. The difficulty is that, as a practical matter, this presumption can ordinarily only be rebutted by the claimant's own statements. In other words, for many impairments, such as back pain, fibromyalgia, depression, and similar mental impairments, in determining whether a claimant's statements about his symptoms are credible, or under the new ruling, consistent, the adjudicator is generally left with only what the claimant has said either directly or indirectly through his doctor, therapist, nurse practitioner, etc. *See Retlick v. Astrue*, 930 F. Supp. 2d 998, 1007–08 (E.D. Wis. 2012). Few claimants are so foolish or careless as to contradict themselves which, if every claim was valid, would not be a problem. Unfortunately, not all claims are valid (otherwise, why have any adjudicatory process at all), which leaves to ALJs the difficult problem of sorting out the good from the bad, the true from the false, with little beyond the claimant's own words to go on.

In any event, this case must be remanded for further consideration of Plaintiff's mental impairment(s) and explanation of why the additional limitations discussed in the FAR were not made a part of the RFC. On remand it would also be helpful if the ALJ would provide more detail in his analysis as to why he found Plaintiff's statements concerning her fibromyalgia less than credible.

23

**CONCLUSION**

For the reasons given above, the case is remanded for further proceedings under sentence four of section 205(g) of the Social Security Act.

**SO ORDERED** this  23rd  day of March, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

24